UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


GROVER WAYNE PEAVY,

                              Petitioner,

-vs-                                                    Case No.  8:05-cv-1985-T-17TBM

SECRETARY,   DEPARTMENT   OF
CORRECTIONS,
                              Respondent.
_____

## ORDER

Pro se Petitioner Grover Peavy petitions for habeas corpus relief pursuant to 28 U.S.C.

§ 2254.  Peavy challenges his conviction and sentence entered by the Circuit Court for the

Tenth Judicial Circuit, Polk County, Florida.

BACKGROUND

Peavy was indicted in case no. 97-04777 for the first degree murder of his wife,

Catherine Peavy. Peavy was convicted as charged after a jury trial. He was adjudicated guilty

in accordance with the verdict and sentenced to life imprisonment. Peavy appealed the

conviction and sentence. On August 18, 2000, the state district court of appeal affirmed his

conviction and sentence in case no. 2D99-860. *Peavy v. State*, 766 So. 2d 1120, 1121-1125

(Fla. 2d DCA 2000). The decision provides, in relevant part:

Appellant, Grover Wayne Peavy, challenges his conviction and sentence for the first-degree murder of his wife, Catherine Peavy. We affirm.

It is uncontroverted that Mr. Peavy killed Mrs. Peavy by stabbing her to death on August 19, 1997, outside her workplace in Bartow, Florida. Mr. and Mrs. Peavy had been married approximately four years.

Mr. Peavy and his partner, Terry Sowards, ran a scrap metal business in Lake City, Florida, nearly 200 miles from Bartow. On the day the incident occurred, Mr. Sowards knew of no business Mr. Peavy had in Bartow, and in fact, the two men had planned to go to Georgia to obtain scrap metal for their business on that day. Nevertheless, on August 19, 1997, Mr. Peavy drove from Lake City to Mrs. Peavy's office located at the Bartow Memorial Hospital Medical Center and confronted her outside the complex during her noon break. Several witnesses heard Mrs. Peavy's screams for help. One  witness testified that Mr. Peavy picked Mrs. Peavy up and threw her against a wall. Another witness saw Mr. Peavy kneeling over Mrs. Peavy while she was screaming and trying to protect herself. At least six witnesses testified to observing Mr. Peavy stab his wife with a knife several times. One witness testified that during the stabbing, Mr. Peavy called Mrs. Peavy a "bitch" and a "slut" and said, "you deserve to die." Onlookers rushed to the scene and two men yelled for Mr. Peavy to drop the knife. Three witnesses testified that Mr. Peavy responded by asking, "you want some of this," while holding the knife in his hand.

Shortly thereafter, Mr. Peavy released the knife to one of the witnesses. The knife had a six-inch blade and was alternately described as a "butcher knife" or a "fillet-type knife." The medical examiner testified that Mrs. Peavy sustained nine knife wounds, at least two of which were fatal; one to her left breast and the other to her liver and diaphragm. Mr. Peavy was arrested at the scene by responding Bartow Police Department officers. Mr. Peavy argues in this appeal that the evidence was insufficient to establish the premeditation element of first-degree murder. We reject that argument as being without merit.

Mr. Peavy next argues that the trial judge erred in failing to declare a mistrial because an answer by Bartow Police Detective Hunt to cross-examination by Mr. Peavy's counsel was an intentional comment on Mr. Peavy's right to remain silent. While we are not convinced that Detective Hunt's answer to defense counsel's question was completely unresponsive, we are convinced that even if it were unresponsive, it was unintentional and no harm occurred. The trial judge should be commended for alertly recognizing a potential problem and immediately acting to diffuse the situation. On the day Detective Hunt testified, he had been on duty without sleep the night before. On cross-examination, Detective Hunt was questioned by defense counsel regarding photographs of Mr. Peavy that he had taken at the Bartow Police Department as follows:

Q: Okay. And what I'd like to do is draw your attention to your activities in the case later in the day back at the police station, the photographs.

A: Right.

Q: Was that at about 1410 hours, about 2:10 in the afternoon?

A: Yes sir. Approximately 2:10 according to my report.

Q: And basically as far as Mr. Peavy's facial expression at that time he maintained a blank stare throughout the photographs; is that right?

A: Yes sir. Mr. Peavy never made a statement to me at any point and he never showed any type of

- THE COURT: Wait. Wait now. We need to be sure he asks you a question before you tell us something. Okay.

DEFENSE COUNSEL: May we approach the bench, Your Honor?

THE COURT: Sure. Is now a good time for them to take a break, Mr. Trogolo?

DEFENSE COUNSEL: Yes sir.

THE COURT: Would you take the jury out.

THE BAILIFF: All rise, please.

(The jury was excused from the courtroom 3:00 p.m.)

THE COURT: My inclination is to ask this witness to go home and go to bed, get some sleep, come back tomorrow after he is well rested and testify. Disagree either one of you?

PROSECUTOR: Depending on the length of the cross. I'm not sure whether [sic] Mr. Trogolo is at on his cross-examination.

DEFENSE COUNSEL: I have some more cross-examination. At this time I, you know, have to object to what he said. It was unresponsive. And move to strike it and move for mistrial.

THE COURT: It was unresponsive and the motion to strike is granted and the motion for mistrial is denied. And I would like to send him home to get some rest and he can come back and finish up when he has not - has not been up all

3

night.

PROSECUTOR: We have no problem, Judge.

THE COURT: Any problem with that?

DEFENSE COUNSEL: I don't have any problem with it.

THE COURT: That means I don't want you to work tonight.

THE WITNESS: I'm not scheduled tonight.

THE COURT: Okay. Go home. Don't talk to anybody. You're on the witness stand. Don't talk about what we did today. Go to bed and come back tomorrow. You're first. Okay?

THE WITNESS: What time do I need to be here?

THE COURT: 9:00 o'clock.

* * * *

THE BAILIFF: All rise, please.

 (The jury returned to the courtroom 3:30 p.m.)

THE BAILIFF: You may be seated.

THE COURT: A Motion to Strike was made and granted. And you're directed to disregard the testimony that the officer who was on the stand before him gave right before you left. If you don't recall what it was that's okay too. That's the idea. Don't let it figure into your verdict, please.

PROSECUTOR: For the record, we are speaking of the last question, Your Honor. A subsequent witness was Bartow Police Officer Thomas Andrews, who responded to the scene of the crime. The following took place on direct examination of Officer Andrews without objection by defense counsel:

Q: Was the defendant placed in handcuffs?

 A: Yes sir.

Q: Who did that?

 A: I did.

4

Q: Did you smell any alcohol on the defendant's body?

A: No sir.

Q: On his breath?

A: No sir. He never spoke.

On cross-examination, Officer Andrews was asked and he answered as follows:

Q: Sir, is it correct when you first saw Mr. Peavy he was being patted down by Detective Matos?

A: When I searched - first saw Mr. Peavy he was standing at the bed or walking. It appeared that he was a few feet away from the bed of the small pickup truck and he was walking towards the bed of that truck.

Q: Okay. And then when you got there did he assume the position to get patted down?

A: He placed his hands on the rail of the bed of the truck, yes sir.

Q: And were you where you couldn't hear what the directions Detective Matos and other officers were giving him there?

A: I couldn't hear any conversation taking place at the vehicle.

* * * *

Q: And it's correct that when you got up there Mr. Peavy had a blank look on his face; is that correct?

A: Yes sir.

Q: And he did not make eye contact with you; is that correct?

A: That's correct.

Q: Basically what he did was look forward and down when you were there?

A: Yes sir.

Another Bartow Police Officer, David Wyant, who responded to the scene of the crime, testified without objection as to his contact with Mr. Peavy as

follows:

Q: Was the defendant there when you got there?

A: Not to my knowledge, no sir.

Q: Was there a time, sir, when you had contact with the defendant?

A: Yes sir.

Q: Where did that take place?

A: At the Police Department.

Q: Did you talk to him?

A: Yes sir.

Q: Were you the officer in charge of booking in the defendant?

A: Yes sir. I conducted the book-in procedure.

Q: Okay. As part of the book-in procedure you have to ask him questions?

A: Yes sir.

Q: About his name?

A: Yes sir.

Q: His age?

A: Yes sir.

Q: How about his height and weight?

A: Yes sir.

Q: Color of eyes?

 A: Yes sir.

Q: Color of hair?

A: Yes sir.

6

Q: And do you also fingerprint the defendant?

A: Yes sir.

Q: Did you do that?

A: Yes sir.

* * * *

Q: As part of the book-in procedures were you giving the defendant instructions?

A: Yes sir.

Q: Did he appear to understand the instructions?

A: Yes sir.

Q: Did you understand his responses?

A: Yes sir.

Q: Did he have any odor of alcohol on his person or breath?

A: Not that I noticed, no sir.

Q: Did he appear to be under the influence of either drugs or alcohol?

 A: No sir.

Q: Were you present when the defendant was notified about the death of Catherine Peavy?

A: Yes sir, I believe so.

Q: What has his reaction to that, physical reaction, if he had any?

A: I don't remember him having any reaction really.

Q: How long were you in the proximity - in the vicinity of the defendant? The book-in procedure how long did that take?

A: Maybe five, ten minutes maybe. Not longer than that.

7

Q: He appeared coherent?

A: Yes sir.

In light of the testimony by the various officers concerning their contact with Mr. Peavy, we conclude that Detective Hunt's comment that Mr. Peavy made no statement to him, was not fairly susceptible of being interpreted by the jury as a comment on Mr. Peavy's right to remain silent. Even if it were considered otherwise, however, we conclude beyond any reasonable doubt that any error was harmless and did not contribute to the jury verdict. *See State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986).

Appellant next argues that the admission of a witness's testimony regarding telephone calls Mrs. Peavy received from Mr. Peavy several weeks before her death was error. We disagree. The words and tone of Mr. Peavy's conversations could be considered threatening and were relevant to show his state of mind and motive.

Mr. Peavy further argues that the trial judge erred in refusing to instruct the jury pursuant to Florida Rule of Criminal Procedure 3.215(c)(2), that Mr. Peavy was being administered psychotropic medication. We disagree. Mr. Peavy's competency was never in issue, and nothing occurred during trial to direct attention to any abnormal behavior of Mr. Peavy. Furthermore, there was no request at the beginning of trial for such an instruction. Any error was therefore harmless. *See Alston v. State*, 723 So. 2d 148 (Fla. 1998).

Mr. Peavy's final issue concerns whether the State's closing argument was so improper as to mandate a new trial. We conclude that while it was improper in part, it does not warrant a new trial. Mr. Peavy's counsel had opening and closing argument. In his opening argument, Mr. Peavy's counsel properly focused only on the premeditation issue and challenged the jury to consider whether Mr. Peavy's actions were "reasonable" for a person planning to commit murder. In response, the State immediately argued as follows:

My answer is yes, it is very reasonable. And I'll tell you why. But first let me say good morning.

* * * *

The question is not whether it's reasonable to you. The question is whether it was reasonable to the defendant. What did he want to do? He wanted to kill Cathy Peavy. Did he do that? Yes, he did. Did he care how? No, he did not. Did he care what kind of clothes he had on? No, he did not. Is it rational? Does it make sense? Well, I bet you as he sits here he probably says oh, boy, what the heck did I do.

8

The question is what happened on August 19th, 1997. And obviously it was reasonable for Cathy. She did not want to die.

You think about Danny Rolling, you think about Timothy McVey [sic], and you think about all the murders committed. None of that was reasonable. But Timothy McVey wanted to send a message.

DEFENSE COUNSEL: I would like to object to his analogy to any other cases that occurred outside of this courtroom and this particular case, Your Honor.

THE COURT: I think you're treading in very dangerous territory and I would caution you not to do that.

PROSECUTOR: Thank you.

I'm asking, and we are asking you to apply your common sense when it comes to what is reasonable and what is not reasonable, what is rational and what is not rational.

But again there's absolutely no question that the defendant Wayne, Grover Wayne Peavy, wanted Cathy Peavy dead and he did it. His mission was accomplished.

If you remember Thomas Hunt. He's a lay witness who gave up his navy blue shirt when everybody was trying to help Cathy. He said there was a change, dramatic change, in his demeanor. That was when position his - his demeanor was the bitch deserves to die. And then he relaxed. He became less angry. His mission was accomplished.

Now is that reasonable? Do we like that? That's not the issue here. That's what he wanted to do on that day.

We conclude that the trial judge's response to defense counsel's objection to the State's argument was the equivalent of sustaining the objection. Clearly, the objection was not overruled. Defense counsel did not pursue the matter further, and there was no request for a curative instruction or a mistrial. Because Mr. Peavy has not met his burden of demonstrating prejudice, we conclude that the State's comments, while improper, were not so egregious as to deprive him of a fair trial. *See Spencer v. State*, 645 So. 2d 377 (Fla. 1994); *Kearse v. State*, 770 So. 2d 1119, 25 Fla. Law W. S 507 (Fla. June 29, 2000).

The other errors complained of regarding the State's closing argument were either proper response, not preserved, or were not improper. We again admonish counsel for the State to not engage in "overkill." There is no room in

the legal profession for those who would constantly seek to tread upon the rules of proper conduct in order to achieve a particular result.  Zealous advocacy is applaudable.  Overzealous advocacy borders on misconduct.

Affirmed.

*Peavy v. State*, 766 So. 2d at 1120.  Peavy did not seek rehearing.  Nor did he pursue certiorari review in the United States Supreme Court.

Peavy filed a pro se motion for post-conviction relief dated December 7, 2000, in which he alleged his trial counsel rendered ineffective assistance. All claims were summarily denied initially. Peavy, however, achieved further collateral review of one claim upon appealing the summary denial. Finding Peavy stated a facially sufficient claim not refuted by the record -- his accusation that counsel did not properly prepare and present a viable defense of voluntary intoxication based on his use of psychotropic medications, the state district court of appeal reversed for further consideration of the claim.

Evidentiary proceedings were held November 25, 2002.[1] On January 24, 2003, the state trial court denied the rule 3.850 motion. Peavy appealed, and following  briefing, on May 21, 2004, the state district court of appeal per curiam affirmed the denial of relief in case no. 2D03-875. *Peavy v. State*, 875 So. 2d 616 (Fla. 2d DCA 2004)[table]. The mandate issued June 15, 2004. Peavy filed the present pro se 28 U.S.C. § 2254 petition, dated October 14, 2005, which is governed by the Effective Death Penalty Act of 1996 ("AEDPA") effective April 24, 1996. *Maharaj v. Sec'y of Dept. of Corrections*, 304 F.3d 1345, 1346 (11th Cir. 2002). The AEDPA imposes a one-year statute of limitations on all habeas corpus petitions. Under 28 U.S.C. §

---

[1]  During the pendency of his rule 3.850 attack, Peavy also filed a pro se petition for writ of habeas corpus alleging ineffective assistance of his appellate counsel in his direct appeal. On October 4, 2002, the petition was denied without elaboration in case no. 2D02-3064. *Peavy v. State*, 829 So. 2d 218 (Fla. 2d DCA 2002)[table].

2244(d)(1), persons in custody pursuant to a judgment of a state court may file petitions for habeas corpus within one year from the latest of four dates specified by the statute:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

The time during which a 'properly filed' application for state postconviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward the limitation period. See 28 U.S.C. § 2244(d)(2); *Artuz v. Bennett*, 531 U.S. 4 (2000). The Court held that, under the AEDPA, "time limits, no matter their form, are 'filing' conditions." *Pace*, 125 S. Ct. at 1814.

For purposes of § 2244(d), Peavy's state judgment became final upon expiration of the time for appealing the affirmance in his direct appeal. This event occurred after Peavy filed his rule 3.850 motion, "properly filed" for tolling purposes only. Awarding this collateral attack statutory tolling will not garner for Peavy a timely result. His rule 3.850 motion was no longer pending upon issuance of the June 15, 2004, mandate in his collateral appeal from the rule 3.850 denial after an evidentiary hearing. Thereafter, he was obliged to bring a timely § 2254 attack within a year unless he had an application which would otherwise toll the limitations period. He did not, and more than a year later, he handed to prison officials for mailing his federal petition on October 14, 2005. Thus, his federal petition is untimely.

However, Peavy alleges, in his petition, that he did not receive a copy of the final

mandate. (See petition, page 6).  Therefore, even though the petition is untimely, the Court, in an abundance of caution will address Peavy's claims.

STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d) and (e) as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this court's review of the state court's factual findings must be highly deferential. Such findings are presumed to be correct unless rebutted by clear and convincing evidence. Similarly, the state courts' resolutions of issues of law-including constitutional issues-must be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme Court of the United States or involved an "unreasonable application" of such precedent. *Williams v. Taylor*, 529 U.S. 362 (2000). Indeed, it is not enough that the federal courts believe that the state court was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." Id. *Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002).

DISCUSSION

Ground One

Peavy asserts he was not competent to stand trial. He also faults the trial court for not conducting a competency hearing. This, he asserts, amounted to a state law and constitutional violation.

Subject matter does not lie to address Peavy's state-law assertions. Determination of whether the state court complied with Florida's procedural rules does not present a federal question. Federal habeas relief is not available for errors of state law as "it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68  (1991).  It is a fundamental principle that state courts

12

are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters. *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997).

Moreover, Peavy defaulted any procedural competency claim by not raising the constitutional dimension of the claim in a timely manner at trial and on appeal. Peavy argued in his direct appeal that the trial judge erred in refusing to instruct the jury pursuant to Florida Rule of Criminal Procedure 3.215(c)(2) that Peavy was being administered psychotropic medication. Peavy did not, however, contend at trial and on appeal that the trial court failed to hold a competency hearing after the defendant's mental competence was put at issue, and such resulted in a constitutional due process deprivation. *See Pate v. Robinson*, 383 U.S. 375, 385 (1966). Under state procedural rules, a *Pate* claim cannot be brought in a rule 3.850 motion. Such must, if at all, be raised at trial and on direct appeal, as an appellate court addressing the claim "may consider only the information before the trial court before and during trial. *See Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995); *James v. Singletary*, 957 F.2d 1562, 1572 (11th Cir. 1992).

Dismissal for failure to exhaust is not appropriate because these grounds are procedurally barred under state law. *Coleman v. Thompson*, 501 U.S. 722 (1991). Ground one cannot be reviewed unless Peavy can demonstrate cause for the default and actual prejudice, *Wainwright v. Sykes*, 433 U.S. 72 (1977), or establish the kind of fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who was "actually innocent" contemplated in *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

Peavy does not show valid cause to excuse his defaults. To the extent he endeavored to show ineffective assistance of appellate counsel, he did not plead facts meeting both prongs of *Strickland v. Washington*, 466 U.S. 668 (1984). *See Jackson v. Herring*, 42 F.3d 1350, 1358

13

(11th Cir. 1995)(in order to constitute cause sufficient to overcome procedural default, counsel's performance must be constitutionally ineffective under *Strickland*), *reh'g, denied*, 51 F.3d 1052 (11th Cir. 1995). As a threshold matter, Peavy did not allege and show that procedural and substantive due process claims regarding his competency to stand trial were preserved for review. In Florida, an issue to be preserved for review must be presented to the lower court and the specific legal argument or ground must be part of that presentation. *Anderson v. State*, 841 So. 2d 390, 401 (Fla. 2003) (citing *Tillman v. State*, 471 So. 2d 32, 35 (Fla. 1985)). Moreover, procedurally barred issues cannot be heard under a writ of habeas corpus. Nor can a petitioner circumvent the bar by couching a defaulted claim in terms of ineffective assistance. *See, Bryan v. Dugger*, 641 So.2d 61, 65 (Fla. 1994). Additionally, Peavy did not plead a sufficient basis showing it was reasonably probable that, but for counsel's error, he would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 289 (2000).

Additionally, to the extent Peavy endeavored to show ineffective assistance of trial counsel as cause in his rule 3.850 proceeding, he did not demonstrate both prongs of *Strickland*. Any cause allegation is procedurally barred by the two-year limitation of rule 3.850 *see Whiddon v. Dugger*, 894 F.2d 1266 (11th Cir.) (recognizing and applying two-year bar of Rule 3.850), *cert. denied*, 498 U.S. 834, (1990), and the state's successive petition doctrine. *See e.g., Pope v. State*, 702 So. 2d 221, 223 (Fla. 1997)(successive postconviction relief motions filed after the expiration of the time limit must be based on newly discovered evidence). With respect to the state's habeas remedy, any (or further) cause allegation is also barred by the two-year limitation of 9.141(c), the state's successive petition, and law-of-the-case doctrines. *See Isley v. State*, 652 So.2d 409 (Fla. 5th DCA 1995)(bar to successive claims which were or could have been raised previously under doctrines of res judicata and law of the

case applies equally to petitions for habeas corpus).

In addition, Peavy does not meet the prejudice component of *Wainright v. Sykes*. Nor can he meet the fundamental miscarriage of justice exception; he has no new and reliable evidence of actual innocence. The Court is therefore prohibited, under *Sykes*, from considering the merits of Peavy's procedural due process claim that a competency hearing should have been conducted.

Peavy's substantive competency claim is unexhausted and therefore, he is not entitled to federal habeas corpus relief on this issue. Dismissal for lack of exhaustion is not necessary, however, because his competency claim would be denied upon application of the AEDPA standards of review; Peavy does not meet his burden under § 2254(d).

The clearly established federal law on this issue, as determined by the Supreme Court, is set out in *Drope v. Missouri*, 420 U.S. 162 (1975), *Pate v. Robinson*, 383 U.S. 375 (1966), and *Dusky v. United States*, 362 U.S. 402 (1960). Under *Dusky*, the standard for mental competency to stand trial is "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." 362 U.S. at 402 (internal quotation marks omitted).

Under *Drope* and *Pate* the standard for determining whether a trial court violates the Due Process Clause by failing to conduct an inquiry into a defendant's competency to stand trial, where no inquiry is requested, is whether the objective facts known to the trial court at the time create a *bona fide* doubt as to mental competency. *Drope*, 420 U.S. at 180; *Pate*, 383 U.S. at 385 ("Where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the [trial] judge on his own motion must impanel a jury and conduct a sanity hearing . . .

15

.").

Treatment with anti-psychotic drugs does not *per se* render a defendant incompetent to stand trial. *Sheley v. Singletary*, 955 F.2d 1434, 1438 (11th Cir. 1992). The defendant must present evidence demonstrating that the dosage given him has affected him sufficiently adversely as to raise a doubt of his ability to consult with his lawyer and to have a rational understanding of the proceedings against him. *See Fallada v. Dugger*, 819 F.2d 1564, 1569 (11th Cir. 1987).

As the state district court of appeal pointed out in affirming Peavy's judgment, his competency was not in question at the time of trial. Peavy presents no basis for concluding that counsel or the trial court ignored facts which would raise a bona fide doubt regarding his competency to stand trial. *Pate*, 383 U.S. at 385. Nor does his federal petition point to objective facts which would positively, unequivocally, and clearly generate the legitimate doubt as to his competency at the time of trial.

Ground one does not warrant habeas corpus relief.

Ground Two

Peavy contends his trial counsel rendered ineffective assistance by not properly preparing a defense. He faults counsel for not obtaining medical documentation as to a diagnosis of posttraumatic stress disorder. Ground two is exhausted to the extent of his ineffective assistance of counsel claim advanced in his rule 3.850 motion which was the subject of the state evidentiary hearing.

"[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). This is not one

of those.

In order to show a violation of the Sixth Amendment right to counsel, Peavy must satisfy the two-pronged test enunciated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). He must show counsel's representation was deficient, i.e., "fell below an objective standard of reasonableness"; and such performance prejudiced him, i.e., there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88. *See also Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000).

A court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). This judicial scrutiny is "highly deferential." *Id.*  A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689-90; see also *Bell v. Cone*, 535 U.S. 685, 698 (2002).

"To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' " *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (*en banc*), *cert. denied*, 536 U.S. 964 (2002) (quoting *Burger v. Kemp*, 483 U.S. 776 (1987)).

The inquiry into whether a lawyer has provided effective assistance is an objective one: a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take. *See Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000), *cert. denied*, 531 U.S. 1204 (2001). An ambiguous or silent record is not sufficient to disprove

17

the strong and continuing presumption of effective representation. Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment. *Id.* at 1314 n.15.

Thus, as *Chandler* makes clear, the presumption afforded counsel's performance "is not . . . that the particular defense lawyer in reality focused on and, then, deliberately decided to do or not to do a specific act." *Id.* Rather, the presumption is "that what the particular defense lawyer did at trial – for example, what witnesses he presented or did not present – were acts that some reasonable lawyer might do." *Id.*

Finally, "[n]o absolute rules dictate what is reasonable performance for lawyers." *Chandler*, at 1317. Absolute rules would interfere with counsel's independence – which is also constitutionally protected – and would restrict the wide latitude counsel have in making tactical decisions. *Id.* The reasonableness of counsel's performance is determined through deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors. *Strickland,* 466 U.S. at 689. Every effort should be made to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's perspective at the time." *Id.*

The prejudice prong requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687. *Strickland* counsels that if a defendant fails to make a proper showing under one of the prongs, the court need not consider the other prong. *Strickland*, 466 U.S. at 697.

In applying the AEDPA standard to ineffective assistance of counsel claims, the federal court's focus is on whether the state decision can be viewed as objectively reasonable. *See Wellington v. Moore*, 314 F.3d 1256, 1261 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide." (internal quotation

omitted)), *cert. denied*, 535 U.S. 1107 (2002). The Supreme Court reiterated the highly deferential standard for evaluating state-court rulings in *Woodford v. Visciotti*, 537 U.S. 19 (2002):

> Under § 2254(d)'s "unreasonable application" clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied *Strickland* incorrectly. *See Bell v. Cone*, 535 U.S. 685, 698-699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Williams, supra*, at 411, 120 S.Ct. 1495. Rather, it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. An "unreasonable application of federal law is different from an incorrect application of federal law."

537 U.S. at 24-25 (reversing grant of habeas relief to a state prisoner under death sentence, finding the circuit court ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d) (citation omitted)).

Peavy was afforded a full and fair hearing on his rule 3.850 claim charging that his trial counsel should have more thoroughly investigated and pursued at trial a possible defense of voluntary intoxication. Peavy failed to establish the facts underlying his claim. In denying his rule 3.850 claim after the evidentiary hearing, the trial court wrote, in relevant part:

> At the evidentiary hearing, Defendant testified that he received a medical discharge from the Marine Corp [sic] having been diagnosed with Schizophrenia and some type of Disassociative disorder. He had also, at some time, been diagnosed with Post Traumatic Stress Disorder (PTSD). According to Defendant, he had been hospitalized six to seven times after his discharge, and he was sure he had been prescribed medications for his conditions beginning at least as early as 1988. Defendant admitted he had been known for not always taking his medication as prescribed.

> Defendant testified that he was taking Noatriptoline, an antidepressant, and a sleeping medication at the time of his arrest. Defendant, however, did not testify that he was in any way intoxicated by the use of these drugs at the time of the offense, nor did he present any evidence that these medications would lead to intoxication when used together or when combined with alcohol. He also did not remember telling his trial counsel that he was taking any medication, or the name of his treating physician. Defendant did, however, give trial counsel the

name of witnesses who could give information regarding his mental history.

Defendant's lead trial counsel, Shelley Wilson, testified that she was assisted in this case by co-counsel, Robert Trogolo, and investigators including Toni Maloney. Each member of the defense team kept the other members of the team advised of the results of their investigation in this case. Ms. Wilson testified she remembered the first time she saw Defendant, he was largely unresponsive and would answer questions in as few words as possible. Ms. Maloney's notes of her first interview with Defendant were consistent with this first impression. Ms. Wilson testified that the crime was committed in the presence of witnesses, the knife used in the attack was recovered, and the Defendant was arrested at the scene as he was attempting to get into his truck to leave. In light of those facts, she was immediately aware that issues relating to Defendant's mental health would be important to his defense. Accordingly, early on she arranged for Defendant to be evaluated by forensic psychiatrist, Thomas McClane, M.D., regarding the Defendant's competency as well as the possibility of developing a defense of not guilty by reason of insanity (NGRI) and PTSD. He was seen by Dr. McClane at least three times, perhaps more.

Ms. Wilson testified regarding her continuing and extensive efforts to obtain the Defendant's military medical records, which came in piece meal. She was not certain whether all the medical records were ever obtained. However, all records obtained were furnished to Dr. McClane for review. There was evidence that Dr. McClane concluded from his contacts with Defendant that Defendant had been off his medications for some time at the time of the offense and Dr. McClane was concerned that may have impacted Defendant's behavior at the time of the offense.

According to Ms. Wilson, Defendant was a poor historian, but she explored every avenue she was aware of to obtain all the information she could on him. She talked with various family members, went to Defendant's residence in Lake City looking for evidence, talked to business associates and made every effort to obtain his military medical records. According to Ms. Wilson, there was no indication in the police reports of drugs of any kind having been found on Defendant's person or in his truck at the time of his arrest. Ms. Wilson talked to a business associate who had had contact with the Defendant the night before the incident, and according to the business associate, Defendant seemed fine.

Ms. Wilson testified that she had handled 25 to 30 murder cases. In every death penalty case, which this one was initially, all mental health issues are investigated. Ms. Wilson noted that in her experience, she could not remember having ever won a case on the voluntary intoxication defense. She also testified regarding her working relationship with Dr. McClane and how thorough he always was in his evaluations. According to Ms. Wilson, even though she had asked Dr. McClane to evaluate competence, PTSD, and NGRI, she was confident Dr.

McClane would have been sensitive to other possible mental health defenses if his evaluations would support such defenses.

Based on all the testimony and evidence available to the Court, the Court is convinced that Defendant's trial counsel investigated all possible aspects of Defendant's mental health and use of medication to the fullest extent possible. There simply was no information provided by Defendant, his family, the police reports, medical records or in Dr. McClane's evaluations which remotely suggested that Defendant was intoxicated at the time of the offense, voluntarily or involuntarily. As such, there was not any reason for trial counsel to attempt to present such a defense at trial. Ms. Wilson's efforts on behalf of Defendant in this regard were extensive, and in the Court's opinion, exhaustive. Certainly, Ms. Wilson's level of representation did not fall below an objective standard of reasonableness. Accordingly, the first prong of *Strickland* clearly is not met. [footnote with full *Strickland* cite omitted]

Additionally, there is no reasonable likelihood that the outcome of the trial would have been different even if defense counsel could have somehow further investigated and presented the voluntary intoxication defense. In Ms. Wilson's broad experience in capital cases, that defense had never succeeded. The State also presented the Court a few excerpts from the trial transcript of testimony of some of the witnesses and the State's closing argument, which summarize the evidence at trial. Those excerpts demonstrate how strong the State's case against the Defendant was. (Copies of those excerpts along with copies of exhibits introduced at the evidentiary hearing are attached). Additionally, those excerpts strongly indicate Defendant knew exactly where he was going when he traveled approximately 200 miles from Lake City to Bartow where he waited for the victim outside her place of employment and fatally attacked her. As stated above, no evidence has been submitted to show the medication Defendant now claims he was taking was intoxicating or that he was intoxicated. Because there is no reasonable probability that the outcome of the trial would have been different, the second prong of *Strickland* also has not been met.

(Resp. Ex. 6, V 3 R 330-33)

The state court's factual findings come to this Court with a presumption of correctness Peavy does not overcome. 28 U.S.C. § 2254(e)(1). Nor does he overcome the strong presumption that counsel's performance relative to potential defenses was in the exercise of professional judgment. *Strickland*, 466 U.S. at 690.

Furthermore, Peavy cannot satisfy *Strickland's* prejudice prong. In view of the ample

evidence adduced by the state of his deliberate acts at the time of the murder, it is objectively reasonable to conclude that there was no reasonable probability of a different outcome even if counsel had performed as proposed.

Ground two does not warrant habeas corpus relief.

Summary

Peavy is not entitled to federal review of any claim in his petition. He had a full and fair opportunity to develop factual bases for his claims at trial and on appeal, and/or in his rule 3.850 proceedings.  Peavy is barred by 28 U.S.C. § 2254(e)(2) from seeking an evidentiary hearing in this proceeding on any factual allegation not timely presented to the state courts.

Accordingly, the Court orders:

That Peavy's petition is denied, with prejudice.  The Clerk is directed to enter judgment against Peavy and to close this case.

**CERTIFICATE OF APPEALABILITY AND
LEAVE TO APPEAL IN FORMA PAUPERIS DENIED**

IT IS FURTHER ORDERED that petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further, ' " *Miller-El v. Cockrell*, 537 U.S.

22

322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on June 22, 2007.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Counsel of Record
Grover Wayne Peavy

23